# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

AUG 20 2025

JEFFREY P. COLWELL
CLERK

Civil Action No. _____

JASON BROOKS,
Plaintiff.

v.

COLORADO DEPARTMENT OF CORRECTIONS,
ADRIANNE SANCHEZ,
JOSHUA URQUHART,
JULIE MILEHAM,
19TH JUDICIAL DISTRICT,
BOB JAROS,
EVAN STATHOPULOS,
ULISSES PALMA,
AMANDA MANBECK,
ANGELA LUJAN,
LYNDA LINDSEY,
TAMMY NELSON,
MARCI HOFFMAN
PHIL WEISER,
DOES 1-10,
Defendant(s).

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

---

### NOTICE

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

## A. PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

Jason Brooks    636 Barberry Drive    Longmont, CO 80503

(Name and complete mailing address)

(925)366-0803    geniusjasonbrooks@gmail.com

(Telephone number and e-mail address)

## B. DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

Defendant 1:    Colorado Department of Corrections    1250 Academy Park Loop

(Name and complete mailing address)    Colorado Springs, CO 80910

Phone: 719-579-9580    Email: cdoc@state.co.us

Defendant 2:    Adrianne Sanchez    Associate Director of Legal Services

(Name and complete mailing address)    1250 Academy Park Loop

Colorado Springs, CO 80910

Phone: 719-579-9580

Defendant 3:    Josh Urquhart    Senior Assistant Attorney General

(Name and complete mailing address)    1300 Broadway, 10th Floor

Denver, CO 80203

Phone: 720-508-6000    Email: joshua.urquhart@coag.gov

Defendant 4:    Julie Mileham    Director of Risk Management

(Name and complete mailing address)    1525 Sherman Street, 5th Floor

Denver, CO 80203

Phone: 303-866-4277    Email: julie.mileham@state.co.us

Defendant 5:     19th Judicial District
                 (Name and complete mailing address)    901 9th Avenue
                                                          Greeley, CO 80631

                 Phone: (970) 475-2400    Email:

Defendant 6:     Bob Jaros                 State Controller
                 (Name and complete mailing address)    1525 Sherman Street
                                                          Denver, CO 80203

                 Phone: (303) 866-6200    Email: bob.jaros@state.co.us

Defendant 7:     Evan Stathopulos    Central Accounting and Vendor Operations Manager
                 (Name and complete mailing address)    1525 Sherman Street
                                                          Denver, CO 80203

                 Phone: (303) 866-6200    Email: evan.stathopulos@state.co.us

Defendant 8:     Ulisses Palma    19th Judicial District Collections Manager
                 (Name and complete mailing address)    901 9th Avenue
                                                          Greeley, CO 80631

                 Phone: (970) 475-2501    Email: ulisses.palma@judicial.state.co.us

Defendant 9:     Amanda Manbeck 19th Judicial District Administrative Office Manager
                 (Name and complete mailing address)    901 9th Avenue
                                                          Greeley, CO 80631

                 Phone: (970) 475-2501    Email: amanda.manbeck@judicial.state.co.us

Defendant 10:    Anjela Lujan               Deputy Controller
                 (Name and complete mailing address)    1300 Broadway
                                                          Denver, CO 80203

                 Phone: (720) 625-5849    Email: angela.lujan@judicial.state.co.us

3



Defendant 11:    Lynda Lindsey          Office of Restitution Services & Collections Manager
(Name and complete mailing address)    1300 Broadway, Suite 1200
Denver, CO 80203

Phone: (720) 625-5868    Email: angela.lujan@judicial.state.co.us


Defendant 12:    Tammy Nelson              Deputy State Controller
(Name and complete mailing address)    1300 Broadway
Denver, CO 80203

Phone: (303)866-6200    Email: tammy.nelson@state.co.us


Defendant 13:    Marci Hoffman                              Court Executive
(Name and complete mailing address)    901 9th Avenue
Greeley, CO 80631

Phone: (970) 475-2500    Email: marci.hoffman@judicial.state.co.us


Defendant 14:    Phil Weiser              Colorado Attorney General
(Name and complete mailing address)    1300 Broadway
Denver, CO 80203

Phone: (720) 508-6000    Email:


Defendant 15: The true names and capacity of DOE Defendants, whether individual, corporate, associate or otherwise, are unknown to Plaintiff at the time of filing this Complaint and Plaintiff, therefore, sue said Defendant by such fictitious names and will ask leave of court to amend this Complaint to show their true names or capacities when the same have been ascertained. Plaintiff is informed and believes, and therefore alleges, that the DOE Defendants are, in some manner, responsible for the events and happenings herein set forth and proximately caused injury and damages to the Plaintiff as herein alleged. All references to "Defendants" in the Complaint include DOE Defendants.

4

## C. JURISDICTION

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

__X__    Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution,
laws, or treaties of the United States).

List the specific federal statute, treaty, and/or provision(s) of the United States
Constitution that are at issue in this case.
 FIRST, EIGHTH, AND FOURTHEENTH AMENDMENTS.

Plaintiff is a citizen of the United States and the State of Colorado.

Defendants 1 and 5 are arms of the State of Colorado being sued in their official

capacities.

Defendants are incorporated under the laws of the State of Colorado.

Defendants have their principal place of business in the State of Colorado.

Defendant Weiser is being sued in his individual capacity.

Defendant Jaros and Mileham are being sued in their individual and official capacities

All other Defendants named by name are being sued in their individual capacities and all

Defendants are citizens of the United States and, upon information and belief, citizens of

the State of Colorado.

## D.  STATEMENT OF CLAIM(S)

*State clearly and concisely every claim that you are asserting in this action.  For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim.  You do not need to cite specific legal cases to support your claim(s).  If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s).  Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

## STATEMENT OF FACTS

1. On December 15, 2022, a jury awarded Plaintiff $3.5 million against Defendant CDOC for violations of Title II of the Americans with Disabilities Act and unconstitutionally denying Plaintiff access to food, violating the Eighth Amendment. The controversy brought in this action is not any part of litigation in *Brooks v. CDOC*, 13-cv-02894-SKC ("*Brooks I*"). In fact, this case specifically involves Defendants conduct post-judgment and is no part of the controversy in *Brooks I* any capacity.

2. Throughout trial in *Brooks I*, while walking between conference rooms and halls outside the courtroom, Plaintiff repeatedly heard Defendant Urquhart make statements to Defendant Sanchez and the rest of his legal team that Mr. Brooks "would never get the money." There were numerous statements made over the days of the jury trial and it appeared that Defendant Urquhart was intending for Plaintiff to hear these remarks.

3. Shortly after the verdict, Defendant Sanchez approached Brooks in court and in front of Plaintiff's lawyer she shook Mr. Brooks hand, and said, "congratulations Mr. Brooks, good luck on parole." It was a very ominous interaction that Plaintiff understood to be a threat, as his fate still rested with the Colorado Parole Board at the time. Defendant Sanchez testimony throughout *Brooks I* made clear that Defendants CDOC and Sanchez believed—even with the benefit of hindsight—Defendant CDOC did nothing wrong despite failing to accommodate Mr. Brooks disability and unconstitutionally denying him access to food for years on end.

4. Plaintiff's judgment in *Brooks I* was for personal injury and sickness, making the judgment

exempt from garnishment under Colorado law pursuant to C.R.S. § 13-54-102(1)(n)[1]. In fact, it was impossible for Plaintiff to be awarded monetary damages against Defendant CDOC when he filed the lawsuit because "[n]o Federal civil action may be brought by a prisoner... for mental or emotional injury *without a prior showing of physical injury* or the commission of a sexual act." Thus, Plaintiff had to have suffered physical injury to be awarded any damages in *Brooks I*.

5.  On January 13, 2023, Defendant CDOC filed two post-trial motions under Rules 50 and 59, arguing the judgment was excessive and asserting CDOC was entitled to judgment as a matter of law.

6.  Soon after, on March 7, 2023, Defendants CDOC agreed to court requested mediation to attempt settling Plaintiff's claims with mediator Skip Netzorg. Defendants Urquhart, Mileham, and CDOC were all involved in the mediation and consideration of settlement negotiations.

7.  On April 3, 2023, despite Plaintiff offering to settle the case for $1,185,000, over two million dollars less than the judgment, Defendant CDOC rejected the offer due to Defendant Urquhart asserting CDOC could not agree to the terms allegedly because, "it cannot release Mr. Brooks from having to use any settlement proceeds to satisfy the judicial debt that he owes to that branch." Defendants were referring to Plaintiff's criminal restitution amount, in which he was ordered to pay $5,131,760.96 in restitution.[2]

---

[1] "Any proceeds of a claim for personal injury or sickness, including compensation for loss of future earnings, are exempt from execution."
[2] Plaintiff has also been charged over $4 million in interest on the judgment, most of which accrued while he remained in prison, violating the Eighth Amendments Excessive Fines and Fees Clause, which is addressed in Claim Four.

8.  On April 10, 2023, Defendant CDOC and Urquhart voluntarily dismissed its Rule 50 motion. The frivolous filing of this motion and its eventual withdrawal deprived Mr. Brooks of over four months of post-judgment interest on his award.[3]

9.  On May 26, 2023, Defendants CDOC and Urquhart filed a RULE 62 MOTION FOR A STAY OF THE JUDGMENT WITHOUT POSTING A BOND OR OTHER SECURITY. Defendants CDOC and Urquhart represented to the Court that "CDOC understands that there likely will be a dispute over the question of what individual or entity should receive the payment of the ultimate final judgment, and it anticipates that the Judicial Branch – as the real party in interest on behalf of Plaintiff's restitution victims – will seek to intervene pursuant to Rule 24 to be heard on that issue."

10. Defendants CDOC and Urquhart further represented that, "it anticipates *seeking direction from the Court* as to whom the final judgment must be paid and, if to more than one payee, in what amounts." Despite the assertions, Defendants avoided seeking any direction from any court on the matter.

11. On April 18, 2023, Plaintiff sent a letter to Defendant Mileham requesting her to submit his settlement request to the State Claims Board[4] for consideration, asserting he believed Defendant Urquhart was "willfully misadvising [her] office and/or intentionally attempting to prevent [Mr. Brooks] personally from benefitting from the settlement." Plaintiff further explained that the "entire purpose of this e-mail is to alert [Defendant Mileham]—as the

---

[3] At least the calculation of interest began at this time according to the Colorado Attorney General, which was incorrect.

[4] "The [State Claims] Board shall have the following powers and duties: … [t]o compromise or settle claims on behalf of the state in the amounts authorized in section 24-30-1515(2)(a)(V) and pursuant to the procedures set forth in section 24-30-1515." C.R.S. § 24-30-1509.

director of risk management—that [he is] going to be holding everyone accountable for their actions if the Board does not formally deny settlement terms [Mr. Brooks] offered." Lastly, Plaintiff alleged that it was his "personal belief" that "[Defendant Urquhart], Defendant Sanchez, Nicole Gellar, and everyone involved in this litigation [in *Brooks I*] are simply retaliating against me personally and are doing everything they can to deprive me of the settlement proceeds."

12. "Any person or party adversely affected or aggrieved in compromising or settling a claim shall pursue such remedy in a district court of this state pursuant to the Colorado rules of civil procedure." C.R.S. § 24-30-1515.

13. On June 23, 2023, in response to Defendant CDOC and Urquhart's assertion that the 19th Judicial District would move to intervene in the case or attempt to garnish the judgment, Plaintiff's attorney, Kevin Homiak e-mailed Defendant Palma, stating, "I represent Jason Brooks in the matter captioned Brooks v. Colorado Department of Corrections, case number 13-cv-02894, in the U.S. District Court for the District of Colorado. The CDOC has represented to the Court that the 19th Judicial District may be moving to intervene in our case, and my client and I would like to speak with the attorney in your office responsible for handing this matter."

14. On June 26, 2023, Defendant Palma responded, stating, "[w]e are not aware of any plan to intervene in the case that is referenced and suggest that you follow-up with the CDOC's counsel about its representation to the court in that case." This statement was misleading at best, as Defendant Palma had been personally assisting Defendants in producing a fraudulent "Warrant for Distraint" against Plaintiff in April and May of 2023.

15. On July 14, 2023, Defendant Urquhart alerted the Court that the "CDOC wish[ed] to correct

9

an inadvertent misstatement in its Motion. In it, CDOC indicated that it anticipated that the

Colorado Judicial Branch or some related entity might seek to intervene pursuant to Rule

24 of the Federal Rules of Civil Procedure to stake a claim on any judgment awarded to

Brooks pursuant to federal and state statutes governing the payment of compensatory

damages to a prisoner or inmate. That statement was inadvertently included in error."

16. Contrary to all these representations, Defendants had already been preparing to ensure

Plaintiff would never personally receive the proceeds of this judgment personally.

17. Upon information obtained through a Colorado Open Records Act ("CORA") request, DOE

Defendants from the Colorado Attorney General's Office had directed, advised, and/or

requested Defendants 19th Judicial District, Palma, DOEs, and/or Manbeck to file a

perfected restitution lien[5] against Mr. Brooks and file it with the Sectary of State's Office.[6]

18. On May 15, 2023, DOE Defendants from the 19th Judicial District created a knowingly

spurious Transcript of Judgment. The spurious document is facially fraudulent, as it states

Plaintiff's date of conviction ("Judgment Date") as being May 15, 2023, which is factually

incorrect. Mr. Brooks was convicted on April 27, 2010. The document also falsely reflects

an "Original Judgment Amount" of $9,169,634.38, when the original judgment amount was

$5,131,760.96.

19. On May 16, 2023, Defendants filed this spurious Transcript of Judgment with the Colorado

Secretary of States Office, asserting that "Per CRS 16-18.5-104(5)(b) (I) File a transcript of

the order for restitution with the secretary of state. From the time of the filing of the

---

[5] This perfected restitution lien will be used interchangeably and/or referred to as the "Transcript
of Judgment."
[6] The Colorado AG asserted privilege to many of documents in Plaintiff's CORA request.

transcript, there shall be a lien that is an encumbrance in favor of the state or the victim, or an assignee of the state or the victim, and shall encumber any interest of the defendant in any personal property. (II) The lien created by this paragraph (b), shall remain in effect without the necessity of renewal for twelve years or until all amounts of restitution, including interest, costs, time payment fees, and late fees are paid. Within twenty-one days after the payment of all such amounts of restitution, the collections investigator or the victim, or the assignee of the state or the victim, shall file a satisfaction of judgment with the secretary of state. The satisfaction of judgment shall be conclusive evidence that the lien was extinguished."[7]

20. Thus, Defendants filed a time-barred, spurious lien document with the Colorado Secretary of State—as Defendant 19th Judicial District asserted the statutory authority to file this document lied in C.R.S § 16-18.5-104(5)(b), which does not apply to Mr. Brooks.

21. Colorado law sets forth two procedures for collecting restitution judgments from criminal defendants. C.R.S § 16-18.5-104 applies "[u]nless the defendant is sentenced to the custody of the executive director of the department of corrections." C.R.S. § 16-18.5-104(1). The second procedure is found in § 16-18.5-106 and applies "[w]henever a person is sentenced to the department of corrections." C.R.S. § 16-18.5-106(1). And it remains when "a defendant is released from a correctional facility." C.R.S. § 16-18.5-106(3). Therefore, there is no statutory authority in Colorado to file a perfected restitution lien against any Defendant

---

[7] Even if § 16-18.5-104 applied to Mr. Brooks, however, it appears there is only a twelve-year window during which a lien can remain "in effect" without renewal. C.R.S. § 16-18.5-104(5)(b) ("The lien created by this paragraph (b), shall remain in effect without the necessity of renewal for *twelve years*."). Thue, the State was required to perfect the lien under § 16-18.5-104 at any time between April 27, 2010 (the date Mr. Brooks was sentenced) through April 27, 2022—which never occurred.

sentenced to the CDOC as a matter of law and CRS § 16-18.5-104 does not apply to Plaintiff.

22. Moreover, even if § 16-18.5-104 applied to Plaintiff, it requires numerous steps to be performed prior to filing a transcript of judgment with the Colorado Secretary of State and is mandatory. See § 16-18.5-104(5) ("Following the investigation required by subsection (3) of this section, the collections investigator may also:").

23. Pursuant to § 13-55-102, C.R.S., "[n]otice of such levy or seizure of *any property* under a writ of execution, writ of attachment, or *other order of court* shall be served upon the defendant debtor by delivering a copy of such notice to the defendant debtor personally or by leaving a copy … at the usual abode … with some member of his family over the age of fifteen years… In the event the defendant is a nonresident … service … shall be made by publication … and the clerk … shall mail a copy of such notice to the defendant debtor … at his or her last-known address, postage prepaid." Because this restitution lien operated as a constructive levy, and because it directly resulted in the seizure of the judgment, C.R.S. § 13-55-102 required prior notice, which Defendants failed to provide.

24. On September 12, 2023[8], Defendant Palma provided Defendant Stathopulos with the spurious transcript of judgment through e-mail, stating, "[a]ttached is the transcript of judgment that was filed with Weld County. This should assist in the development of a Warrant for Distraint."

25. A warrant for distraint is an administrative tool authorized under Colorado law (like § 39-21-114, § 24-30-202.4(2.5), etc.) that lets the state seize assets from individuals or entities

---

[8] These e-mails chains included Defendants Nelson, Hoffman, Lindsey, Lujan, Stathopulos, Palma, and Manbeck.

who owe a qualifying debts to the state. There is no Colorado statute that authorizes a warrant for distraint to enforce criminal restitution orders on any Defendant sentenced to the Department of Corrections. If any debtor was formerly incarcerated and ordered to pay restitution, civil collection procedures must follow C.R.S. § 16-18.5-106 and its attendant statutes.

26. On September 18, 2023, Defendant Stathopulos responded to Defendant Palma's e-mail, stating, "[t]hank you for providing the Transcript of Judgment and debtor's SSN." Defendant Stathopulos further clarified that Plaintiff was not set up in "CORE"[9], but stated, "we can still prevent a payment from being issued to him (under the provided SSN) through CORE."

27. Colorado's Vendor Offset Law (the "Intercept Statute"), C.R.S. § 24-30-202.4(3.5)(a)(I)(A)-(E) lists out the types of debts that may be withheld by a state agency under the intercept statute, which include (1) unpaid child support, (2) unpaid balance of tax, (3) unpaid debt owed to the state as a result of a final agency determination of any amount of which "has been reduced to judgment," (4) unpaid student loans, and (5) amounts required to be paid to the unemployment compensation fund. The statute does not list restitution as a debt that can be intercepted.

28. If restitution was a type of debt permitted to be intercepted under the Intercept Statute, Plaintiff and all other criminal Defendants sentenced to CDOC in Colorado would have already been set up in CORE and would have been notified "of the controller's authority to withhold debts owed to state agencies under the vendor offset intercept system pursuant to section 24-30-202.4 (3.5)(a)(I) and the types of debts that are subject to withholding under

---

[9] Upon information and belief, CORE is the computer system the State uses within Colorado's Vender Offset system. The specific acronyms will be uncovered through discovery.

said system." C.R.S. § 24-30-202(1).

29. In Defendant Stathopulos' September 18th e-mail, he admitted that "[b]efore placing the debt and having this go through the standard vendor offset process, Judicial would need to be set up as an intercepting entity, including account coding for where Intercepted/offset funds should be transferred, and the debt type would have to be added. We would also have to *develop processes for managing Judicial debts*: coding IRM (Intercept Request Maintenance) documents, access and usage of the INTR (Intercept Request) table, IT (Intercept Transfer) documents, contacts that can answer questions on Judicial debts or Intercepts, etc."   Thus, the Intercept Statute had never been used to intercept judicial/restitution debts and Defendants set up an entire coding to process within CORE to intercept Plaintiff's specific judgment.

30. Defendant Stathopulos' then asks Defendant Lujan, "please let me know if Judicial wants to be officially set up as an intercepting entity in CORE and we can work on the above. I don't really have a good idea of the amount or volume of Judicial debts that could/should be added to CORE."

31. On September 19, 2023, Defendant Lujan responded to Defendant Stathopulos' e-mail, stating, "[w]e do plan to establish Judicial as an intercepting entity." Defendant Lujan continued, asserting that "if this process will take too long to setup [in CORE] maybe an option would be to use the COLL debt type since already established? Once funds are collected and received by DPA, we could work with DPA's controller to do an internal transfer to obtain the funds." Finally, Defendant Lujan clarified that "per [Defendant] Lynda Lindsey, Brad Duca and the AG's office contacted Judicial on this situation so all are aware." Thus, DOE Defendants in the AG's office were clearly advising Defendants throughout this

14

process.

32. In fact, the Intercept Statute states that "the attorney general shall be the legal adviser of the controller and to the attorney general shall be referred any question concerning the legality of any obligation by or claim against the state." C.R.S. § 24-30-202(10). Thus, DOE Defendants agent AG's were advising Defendants throughout this process.

33. On September 20, 2023, Defendant Stathopulos' responded to Defendant Lujan, stating he would reach out to Defendant CDOC to "know how they plan on paying out the Judgment." He continued, asking, "if we are not sending interfaced debt data into CORE but just *setting this one intercept up manually for this special case*?"

34. On September 21, 2023, Defendant Lindsey wrote an e-mail thanking all the Defendants "for help getting things set up." Defendant Lindsey further acknowledged that she provided, "an update to our representative within the AG's office [DOE Defendants]."

35. On September 25, 2023, Defendant Lujan sent an e-mail to ensure Defendant CDOC and its agents knew "when they setup vendor record (ensure W-9 matches to TIN on debt record) and timing for when make the payment." She went on to advise."[h]ere is Judicial information requested to setup the system. Please be sure to use entity of JAAA not JXXX as this is specific to Judicial proper (us) and not the other independent Judicial departments." Defendant Lujan further provided the newly created coding information within CORE.

36. On the same day and in response to Defendant Lujan, Defendant Stathopulos confirmed the coding requirements to set up the intercept, stating, "JAAA has been added to the ENTY and INTEA tables, and JUDG has been added to the DBTYP table." Defendant Stathopulos, however, had to "submit the debt to the State Controller ([Defendant]Bob Jaros) for approval and follow up in the next week or two."

37. On October 20, 2023, Defendant Stathopulos sent an e-mail, stating he had a discussion with Defendant Jaros, "but the matter of adding it [Plaintiff's restitution debt] to the Intercept Request table in CORE *remained unresolved*. At the time, I asserted that communication between the state (ideally the AG's office) and Tenth Circuit Court of Appeals is warranted. I'll touch base with Bob again and provide an update by the end of next week."

38. In this same e-mail, Defendant Stathopulos had found out that "Risk Management from within the OSC will end up paying the judgment, not CDOC,"[10] clarifying to Defendants that "Risk Management is aware of the situation and will update us after the final amount is determined, but before the plaintiff is paid." Every e-mail sent by Defendants and cc'd after this one includes Defendant Mileham. Thus, Defendant Mileham was fully aware of the scheme and her office's responsibility to pay the judgment from at least October 20, 2023.

39. On October 25, 2023, Defendant Stathopulos e-mailed Defendants a screenshot showing the intercept request had been successfully entered into CORE and stated, "[t]he debt has been approved and placed in CORE." Thus, despite their being a question of the legality of this process, Defendant Jaros approved adding Plaintiff's restitution debt into CORE.

---

[10] It must be noted, in Plaintiffs April 18, 2023, letter to Defendant Mileham, he specifically told her "the judgment or settlement in this case will be paid by the risk management division because this case falls under federal law." Thus, Defendant Mileham didn't even understand her offices responsibility to pay the judgment, despite the law being clear on the issue.

16



40. On December 20, 2023, Defendant Lindsey wrote an e-mail, stating, "I'm just wondering, has anything happened with this judgment payout? One of the defendants' victims is inquiring about the judgment and any efforts we're making to intercept it. I appreciate any updates, and happy holidays!" This shows a coordinated effort with Plaintiff's victims of his criminal case.

41. On March 11, 2024, Defendants CDOC's Rule 59 Motion was denied in *Brooks I*. Soon after, on March 15, 2024, Defendant Urquhart alerted Plaintiff through his counsel that Defendant "CDOC has decided not to appeal. I'm not sure about all of the logistics, but [Defendant] Julie Mileham did indicate that she will need W-9s for you and Mr. Brooks to start processing the judgment."

42. On March 13, 2024, Defendant Mileham altered Defendant's that payment was about to be made and began preparing Defendant to execute the intercept, stating, "[t]he appeal has now resolved and the payment will process upon receipt of W-9s from the attorney and the plaintiff. I would expect the payment to be made within the next two weeks. Please let me know what other information you need from me. Before we send the payment to our accounting team we will let you know that it is processing."

17

43. In response, Defendant Stathopulos asked, "[w]ill DPA Accounting manually offset this payment or will it go through the automated CORE process? In order for the payment to offset in CORE, DPA accounting must set up the plaintiff as a vendor in CORE under his SSN ending in -61. They then must issue his portion directly to the newly created vendor code. I know they often issue settlements to a miscellaneous vendor code, but that will not offset since those records are not associated with a Taxpayer ID Number. I can work directly with DPA Accounting and assist with testing in CORE MA1 to ensure everything works." This shows the level of coordination and effort that went into this coding process to ensure its success.

44. In reply, Defendant Mileham stated, "[n]ormally we do it from our side. Nathan Manley usually does the debt check and lets us know what to send where. I'll confirm that is the way we'll do this one and let you know if we need anything." Thus, this intercept was set up in this one special case and done manually.

45. On March 17, 2024, Mr. Homiak e-mailed Defendants Urquhart and Mileham, inquiring whether Plaintiff could receive a wire transfer/ACH deposit. In response, on March 18, 2024, Defendant Urquhart responded, stating, "I'm looping in [Defendant] Julie Mileham on this…She can probably tell you the logistics of everything much more accurately than I can."

46. On the same day, despite fully understanding the judgment would be intercepted through the newly created coding system, ignoring Colorado's Office of Risk Management core values (which include "transparency") and fully understanding CDOC would not—in fact—be paying the judgment because Defendant Mileham's Office would be doing so, Defendant Mileham omitted telling Mr. Homiak anything knowing the intercept would occur and

simply stated, "we are not able to send the payment by wire or ACH." These omissions violate Defendant Milham's statutory code of ethics, C.R.S. § § 24-18-101 – 105 and C.R.S. § § 24-18-108 – 110.

47. In reply, Mr. Homiak e-mailed Defendant Mileham and requested for her office to "make the check for the payment of the judgment and post-judgment interest to Jason Brooks and send it to my office at the address below with the other checks." Defendant Mileham again remained silent despite knowing no check would ever make it to Plaintiff's hands, nor any money to his bank account.

48. Later that day, on March 18, 2024, Defendant Mileham e-mailed DPA Nathan Manley as planned, stating, "[w]e are making a payment in the next few days on a court case that we lost to Jason Brooks. Attached are all the W-9's that are impacted here…can you begin the debt checks for these for me."

49. In speaking with his counsel during this time, Plaintiff inherently knew the Defendants were scheming to steal the judgment under the guise of legality. The statements made by Defendant Urquhart outside the courtrooms during *Brooks I* about how he would "never get the money," remained seared in Plaintiff's mind. In response to his repeated concerns, Mr. Homiak reassured Plaintiff Defendant CDOC would pay the judgment and if anything happened, he would be "shocked." Namely because if the judgment were to be intercepted, Defendants would have been intentionally lying to Mr. Homiak and Defendants CDOC and Urquhart would have made numerous misrepresentations to the Court throughout *Brooks I*.

50. Despite Plaintiff's attorney attempting to provide reassurances, Plaintiff remained unsatisfied and diligent in trying to uncover this conspiracy.

51. On Friday night March 22, 2024, Plaintiff uncovered the spurious restitution lien on the

Colorado Secretary of State's website. Plaintiff then called Mr. Homiak to discuss what Plaintiff knew was about to happen.

52. On March 25, 2024, Mr. Homiak e-mailed Defendants Urquhart and Mileham, inquiring about the payment, asking point blank, "[i]f there's any disagreements whatsoever about the amounts of these checks, any deductions to them, or when they will be cut, I'd like to know as soon as possible (and, in any event, no later than 9:00 a.m. tomorrow), so that we can schedule a status conference with Judge Crews to get them resolved." Thus, Defendants Mileham and Urquhart knew court intervention was both requested and required prior to making this payment.

53. In response, Defendant Mileham again remained silent, but Defendant Urquhart responded with an unintelligible e-mail, stating, "CDOC has request the issuance of warrants to the parties and in the amounts listed below. Please note that the State's Accounting System is being upgraded statewide. This may delay the issuance of the warrants a few days. As such, additional days of interest will be added to the amount requested for satisfaction of the judgment."

54. On March 26, 2024, at 11:45am – 12:15pm, despite fully understanding the legality of the intercept would be contested and the question of its legality being currently challenged through Mr. Homiak's statements, Defendants Mileham, Stathopulos, and Jaros had a meeting via google to execute the intercept, which was completed successfully.

55. On March 27, 2024, Assistant Attorney General Drew Williams alerted Mr. Homiak via e-mail that, "I wanted to let you know that moments ago I received notice that the payments had been process and have issued. Mr. Brooks's payment was intercepted by the state."

56. On March 27, 2024, DOE Defendants in the AG's office directed Defendant 19th Judicial

20

District and all the Defendant districts agents to "get rid of the money as fast as possible"
by paying Plaintiffs restitution victims in case the money being intercepted, "would be
challenged." On that same day, over $3.6 million was sent through the mail to Plaintiff's
restitution victims, some with addresses 15+ years old. Money has been misappropriated,
victims have been defrauded due to numerous accounting errors, and unknown amounts
were never received and sit in Defendants' 19th Judicial coffers currently unclaimed.

57. On this same day, Defendant CDOC, lacking any custody control of Mr. Brooks person and
no longer being custodian of his restitution debt, sent a letter to all Plaintiff's restitution
victims and still referring to him as an "inmate".

58. In this letter, Defendant CDOC cites the Prison Litigation Reform Act ("PLRA") as the
basis for the authority to intercept this money. However, Mr. Brooks was not an inmate at
this time and had been discharged from parole December 12, 2023. Moreover, Defendant
CDOC itself argued, that "the sole basis for the intercept in this case was section 24-30-
202.4, Colo. Rev. Stat. Any argument involving restitution judgment liens or other statutory
provisions is irrelevant and should be ignored." Thus, the PLRA was no part of the legal
justification to divert Plaintiff's judgment for private benefit, making this letters contents
completely fabricated and legally baseless.

59. At no time was Plaintiff alerted to the creation or filing of the Transcript of Judgment, nor
the warrant for distraint. Under Colorado law, a debtor is required to be informed about the
seizure before it happens, the intent of the government to seize the property, and a chance
to redeem it. No pre-deprivation procedural due process was provided Plaintiff and no post
deprivation remedies exist.

60. On February 3, 2025, Mr. Brooks received a 1099-MISC tax form from Defendant

21

Stathopoulos office, Central Accounting and Vendor Operations, listing the entire judgment of $3,500,000 plus interest as "other income" that he must report to the IRS and Colorado Department of Revenue on his federal and state tax returns, leaving a tax burden on the judgment Plaintiff has no money to pay.

61. Placing the entire judgment amount as gross income violates Defendant Jaros State Controller Technical Guidance, which states, "[i]f there is a Personal Physical Injury and there are other causes of action included in the Complaint, under IRS revenue ruling, then the entire recovery is for Personal Physical Injuries excludable from gross income." Thus, the $3.5 million judgment should have been excluded from gross income on the 1099-MISC tax form issued to Mr. Brooks, just premised off the reading of his Federal Complaint in *Brooks I.* The interest gained on the judgment is the only gross income that should have been listed on this form and issued to Plaintiff.

<u>**CLAIM ONE**</u>
**Fourteenth Amendment Procedural Due Process Violation**

62. Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

63. Plaintiff was personally deprived of a $3.5 million (plus interest) personal injury and sickness judgment through an unlawful interception initiated by Defendants and unlawfully executed and hidden.

64. Defendants intentionally, maliciously, and unlawfully violated the Fourteenth Amendment by failing to provide Plaintiff with notice of the creation of the spurious lien document, the warrant for distraint, and violated the express terms of Colorado Intercept Statutes requirement "notifying the other party to the contract *of the controller's authority to withhold debts owed to state agencies under the vendor offset intercept system pursuant to section 24-30-202.4 (3.5)(a)(I) and the types of debts that are subject to withholding under*

22

*said system.*" C.R.S. § 24-30-202(1).

65. Defendants filed a fraudulent Transcript of Judgment with the Colorado Secretary of State under C.R.S. § 16-18.5-104, a statute that does not apply to Plaintiff, making the lien *void ab initio*. This filing was not a passive recordation—it was the *operative act* that immediately triggered Defendant Stathopoulos to execute the intercept after receiving the Transcript of Judgment from Defendant Palma on September 12, 2023, create a warrant for distraint, and enter the newly created coding data into CORE on October 25, 2025, after it was approved by Defendant Jaros, resulting in the diversion of Plaintiff's $3.6 million judgment proceeds to the 19th Judicial District for alleged distribution to restitution victims in a single day.

66. A lien that is *void ab initio* creates no enforceable property interest in favor of the State, and any seizure based on such a lien constitutes an unlawful taking and deprivation of property without due process of law in violation of the Fourteenth Amendment.

67. Additionally, C.R.S. § 13-55-102 provides that "before any levy or seizure of property is made," the judgment debtor must be given written notice of the levy or seizure. This notice requirement exists to ensure that property owners have an opportunity to assert applicable exemptions or challenge the legality of the execution before their property is taken. Defendants intentionally and maliciously failed to provide this mandatory notice to Plaintiff.

68. Because the restitution lien was created for the express purpose of effectuating an imminent seizure, it falls within the ambit of "levy or seizure" under C.R.S. § 13-55-102. The statute's plain language does not limit its application to the moment of physical taking; it covers any governmental act that operates as a levy, including preparatory acts that directly restrain and appropriate property.

23

69. The type of lien Defendants used operated as a constructive levy. It is a legal encumbrance on property that, by its nature and immediate statutory effect, restrains the debtor's rights in the property and—in this case—authorized its transfer to private parties. Courts have long recognized that constructive levies can fall within "levy or seizure" notice statutes when the lien is the essential prerequisite for the property's taking. Here, without the fraudulent restitution lien, Defendants could not have lawfully initiated the intercept under any legal rationale, and the funds would have remained in Plaintiff's possession. All downstream actions—including seizure of funds, disbursement to third parties, and issuance of IRS Form 1099—are likewise void, as they were predicated on an invalid and *ultra vires* lien.

70. Defendants provided no prior notice to Plaintiff before filing the restitution lien or at any time before initiating the intercept. This intentional omission deprived Plaintiff of the statutory right to contest the seizure and to assert that the funds were exempt under C.R.S. § 13-54-102(1)(n) as personal injury and sickness damages. By failing to provide notice as required by C.R.S. § 13-55-102, Defendants violated Colorado law and deprived Plaintiff of procedural due process guaranteed by the Fourteenth Amendment.

71. While it is undisputed that Defendants failed to provide Plaintiff with any pre-deprivation due process, in express violation of the Intercept Statute and clearly established constitutional law, Plaintiff also has no post-deprivation remedies available to him.

72. The intercept statute permits disbursements to be withheld only at the direction of a "state agency," and explicitly requires that any refund be issued only upon submission of a "proper voucher" by the "head of a department." *See* C.R.S. § 24-30-203(1).

73. "In all cases not otherwise provided for by specific statute, whenever any money not owed or belonging to the state of Colorado is collected or received by the state of Colorado

24

*through mistake either of law or of fact*, upon proper showing made to the satisfaction of the head of the department of the state of Colorado that collected or received such money and upon proper voucher drawn by such department head and approved by the governor and controller, the controller is authorized to draw a warrant or check to refund such money to the person from whom it was collected or received." *Id.*

74. Defendant 19th Judicial District cannot be considered a state agency under the Intercept Statute because of the simple fact that it does not have a department head authorized to draw a voucher. As a result, Plaintiff was knowingly and intentionally left without any administrative remedy to recover the intercepted funds. Thus, even if Defendants were able to obtain a perfected restitution lien against Plaintiff (they can't), it was timely filed (it wasn't), a judicial district could plausibly be considered a "state agency" under the Intercept Statute (an impossibility), Plaintiff was given notice of the Controller's authority to withhold restitution debt under the Intercept Statute (as it requires), and the Intercept Statute listed restitution debt (it doesn't), this structural deficiency in and of itself renders the statutory scheme unconstitutional as applied to Plaintiff, as it deprived him of property without notice, a hearing, or a meaningful opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment.

75. DOE Defendants further ordered Defendant 19th Judicial District and its agent to "get rid of the money as fast as possible." In fact, Defendant CDOC and Urquhart argued that Plaintiff would get a "double recovery" if Defendant CDOC was required to personally pay Plaintiff's judgment that he is legally entitled to. Defendants anticipated Plaintiff would bring a challenge to the seizure and knowing a challenge would come once the seizure actually happened, Defendants maliciously placed over $3.5 million in the mail to restitution

25

victims in a single day "in case it was challenged" in an attempt to deprive Plaintiff of any post-deprivation remedies to recoup his judgment and intentionally prevent and delay his ability to use the funds.

76. Colorado courts have further clarified that enforcement of restitution must follow the procedures of civil judgments and basic procedural protections available to civil judgment debtors. Defendants intentionally subverted these processes and procedures, even after Defendants CDOC and Urquhart represented in *Brooks I* that "it anticipates *seeking direction from the Court* as to whom the final judgment must be paid and, if to more than one payee, in what amounts." Defendants never sought this direction because they knew what they were doing was illegal and they could care less—they simply wanted to accomplish their goal of punishing Mr. Brooks.

77. Even if § 16-18.5-104(5)(b) applied to Plaintiff, which it does not, "[a] transcript of the order for restitution may be filed with the secretary of state for the purpose of creating a lien. The lien shall be created in the same manner as a judgment in a civil case and shall remain in force until satisfied, released, or expired. *The restitution order shall be treated in the same manner as a civil judgment for purposes of enforcement.*"

78. As a result, section 16-18.5-104 still incorporates all the enforcement procedures and protections of civil judgments—which require notice. Therefore, Defendant intentionally and maliciously failed to provide Plaintiff with any due process knowing he would have stopped their conspiracy in its tracks had he been given any pre-deprivation notice of their plan to prevent him from personally receiving his judgment by having it illegally diverted to Defendant 19th Judicial District.

79. Defendant Colorado AG fully understands that the right to be heard before being

condemned to suffer grievous loss of any kind is a principle basic to our society and the

fundamental requirement of due process is the opportunity to be heard at a meaningful time

and in a meaningful manner before any citizen is deprived of life, liberty, or property.

Defendant Weiser has therefore failed to ensure that's his agent attorney's understand

Colorado citizens basic fundamental constitutional rights.

80. Because Plaintiff was denied pre-and-post-deprivation due process and was left with no

statutory path for recovery due to the legal status of Defendant 19th Judicial District, he was

deprived of his property without due process in violation of the Fourteenth Amendment.

The state's failure to provide any avenue for notice, hearing, or refund—when combined

with the deliberate use of fabricated legal instruments—represents a fundamental

deprivation of constitutional rights.

81. Plaintiff seeks declaratory and injunctive relief, compensatory damages, damages for

emotional distress and loss of use of funds, loss of quality of life, and punitive damages

against all officials whose conduct was intentional, reckless, and/or negligent in depriving

Plaintiff of constitutional protections.

82. Plaintiff seeks injunctive relief against Attorney General Phil Weiser in his official capacity

to prevent ongoing and future constitutional violations stemming from policies, directives,

and failures to adequately train staff attorneys. These failures resulted in the execution and

creation of a unlawful restitution lien and the deprivation of Plaintiff's protected property

interest without notice or opportunity to be heard. The Attorney General's Office, as a

supervising authority over legal enforcement in the state, must be ordered to adopt measures

to ensure compliance with constitutional standards, including retraining or disciplinary

oversight of personnel who engage in such conduct.

## CLAIM TWO

### Civil Conspiracy

83. Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

84. Defendants have agreed, by words and conduct, to accomplish an unlawful goal through unlawful means. The unlawful goal includes, without limitation, ensuring Plaintiff was personally deprived of the proceeds of *Brooks I* by having the award illegally intercepted and paid to the victims of his criminal restitution in a single day. The unlawful means includes, without limitation, (1) ordering Defendant 19th Judicial District and its agents to create and file a time-barred, spurious lien document to obtain an invalid "warrant for distraint" under a statute that does not apply to Plaintiff (2) creating a new coding system in CORE to add Defendant 19th Judicial District as an intercepting entity within Colorado's Intercept Statute for this "special case" (3) intentionally hiding Defendants conduct from Plaintiff and his attorney to ensure Plaintiff was not given any pre-or-post deprivation due process (4) illegally routing intercepted state funds to an ineligible entity in violation of statutory payment pathways, in direct violation of Colorado's Intercept Statute[11] (5) violating Colorado's civil recovery statutes (6) violating Colorado's Restitution recovery statutes and (7) violating Colorado's exemption statutes.

85. These Defendants have engaged in overt acts to accomplish their unlawful goal or means, as identified below.

86. Defendant intentionally hid the conspiracy from Plaintiff for almost a year. Mr. Brooks was

---

[11] The Intercept Statute requires all intercepted funds to be deposited with the state treasurer, which never occurred. *See* C.R.S. § 24-30-202.4(3.5)(a)(IV) ("Any moneys collected through the offset of state vendor payments pursuant to this subsection (3.5) shall be deposited with the state treasurer.").

never served or notified about the filing of the spurious lien, the intention to intercept the judgment, nor any opportunity to contest or prevent the loss of his property before it happened. In fact, despite Defendants Urquhart, CDOC, Mileham, and Jaros knowing Mr. Homiak requested court resolution prior to any money being diverted on March 25, Defendants Stathopoulos, Mileham, and Jaros had a meeting the following day, ignored the warning, and executed Defendants' plan, making a conscious choice to finalize the intercept with knowledge that it was likely illegal.

87. Even if Defendants Jaros and Mileham processed the disbursement based on the Intercept Statute, as they will likely claim, they fully understood Defendant 19th Judicial District is not a state agency under the statute because they had to create an entire code to set up Defendant 19th Judicial District as an intercepting entity. In fact, Defendant Stathopoulos admitted that the Controller and Office of Risk Management "would also have to develop processes for managing Judicial debts: coding IRM (Intercept Request Maintenance} documents, access and usage of the INTR (Intercept Request) table, IT (Intercept Transfer) documents, contacts that can answer questions on Judicial debts or Intercepts, etc.." Indeed, Defendant Stathopoulos admitted he had no "idea of the amount or volume of Judicial debts that could/should be added to CORE." Thus, this entire conspiracy targeted Mr. Brooks specifically and this entire process had never been completed before.

88. Fact remains, there is no statutory mechanism under the Intercept Statute to transfer funds to any judicial district, the intercepted funds were never deposited with the State Treasurer (as required), and Defendants Stathopoulos, Mileham, and Jaros knew no "proper voucher" could be drawn by a department head to allow a refund, intentionally leaving Plaintiff with no remedy—a key overt act in the conspiracy. As a result, Defendants Mileham and Jaros

29

acts were *ultra vires* and they knowingly violated their statutory code of ethics, fully

understanding their respective offices had no legal authority to do what was done.

89. Defendants filed a fraudulent restitution lien—Defendant 19th Judicial District filed a

transcript of judgment with the Secretary of State under C.R.S. § 16-18.5-104(5)(b) even

though Plaintiff had already been sentenced to and released from the Colorado Department

of Corrections. The statute explicitly exempts former DOC inmates, and no valid process

was followed to create such lien, even if the statue did apply to Plaintiff. Filing a knowingly

invalid lien is a deliberate misuse of judicial power and an overt act.

90. DOE Defendant AG agents directed the 19th Judicial District to "get rid of the money as

fast as possible" by paying the victims—before any legal challenge could be made. This

implies anticipatory knowledge that the intercept was likely illegal. Deliberately dispersing

the funds in a single day was an overt act in furtherance of a conspiracy with the malicious

intent of depriving Plaintiff of his personal property permanently.

91. Defendants coordinated a misuse of state power in furtherance of a plan to deny Plaintiff

any and all due process for private benefit through use of an unauthorized statutory

mechanism (C.R.S. § 24-30-202.4). Defendant Lindsey coordinated with victims of

Plaintiff's criminal case to ensure the intercept occurred—a weaponization of state power

for private benefit.

92. Defendants CDOC, Sanchez, Urquhart, and Mileham all usurped the State Claims Boards

authority to settle claims on behalf of the State to ensure Plaintiff would never personally

receive any money from this judgment. In fact, in mediation Defendant Mileham said she

would not even bring any settlement offer to the Claims Board attention if Plaintiff would

not agree to have over 95% the money go to his restitution victims voluntarily.  The State

30

Claims Board consists of the executive director, the state treasurer, and Defendant Weiser. *See* C.R.S. §§ 24-30-1508, 24-30-1515. To prevent any person outside of Defendants control and persuasion from being able to override the conspiracy in the interest of Colorado taxpayers, Plaintiff's settlement offer of $1,185,000 was intentionally usurped from the Claims Board consideration, as Defendants defrauded state taxpayers to ensure Plaintiff was deprived of any proceeds personally. Yet another overt act in furtherance of this civil conspiracy.

93. Despite having notice of the facially fraudulent lien, Defendants and other agencies have refused to remove it from the Secretary of States office—causing ongoing harm and constituting a continuing overt act to steal any future property from Plaintiff.

94. Under the Intercept Statute, even if Defendant 19th Judicial District could plausibly be considered a state agency, as Defendants suggest, "[a] state agency is responsible for the collection of any debt owed to it." C.R.S. § 24-30-202.4(1). The coordinated effort by Defendants, directly or indirectly, through the Offices of the State Controller, Risk Management, Restitution Services, CDOC, Central Accounting and Vendor Operations, Attorney General, Plaintiff's restitution victims, and State Court Administrator in specifically advising and directing Defendant 19th Judicial District on how to collect on its own debt were overt acts and yet another direct violation of the Intercept Statute.

95. Plaintiff has suffered damages and injuries caused by the acts of these Defendants to accomplish their unlawful goal.

96. Plaintiff is entitled to nominal, compensatory, and punitive damages and all other appropriate equitable and legal relief for these intentional, egregious, and malicious acts.

97. Because any judgment from this case would not be for personal injury or sickness, it would

31

not be exempt from garnishment or taxation. Thus, compensatory damages of approximately $14 million will be required just for Mr. Brooks to regain the $3.6 million he would have had Defendants not chosen to do what they did. However, the exact amount will be calculated to the penny, with interest, to determine the specific amount needed to make Plaintiff whole.

98. Plaintiff respectfully requests that this Court refer this matter to the United States Department of Justice for investigation into potential criminal violations by state officials, including civil rights violations under 18 U.S.C. §§ 241–242, and fraud and misconduct surrounding the execution of a restitution lien and seizure of exempt personal injury funds.

99. Plaintiff also request the Court to make a referral to the Colorado Office of Attorney Regulation Counsel for investigation into attorney misconduct, including ethical violations involving deceit, abuse of authority, and misrepresentation and any other authority to investigate the actions of Defendant Jaros and Mileham.

## CLAIM THREE
### First Amendment Retaliation

100. Defendants' motive in creating their hidden conspiracy could not be clearer: Defendants CDOC, Sanchez, and Urquhart hated Mr. Brooks, were upset they got destroyed in litigation by an inmate who essentially litigated the case *pro se* for over a decade, and made it their mission to ensure all Defendants and their agency agents retaliated against for Plaintiff engaging in protected First Amendment activity—namely, filing and prevailing in a federal civil rights and ADA lawsuit against Defendant CDOC. A First Amendment retaliation claim arises when a government actor punishes or takes adverse action against a person because that person exercised constitutionally protected speech, petition, or association rights.

101. As a direct response to Plaintiff's victory in *Brooks I*, Defendants goal was to punish Plaintiff for winning the judgment by ensuring he would not personally receive a single penny of the judgments proceeds and—better yet—leave him with an unpayable tax burden that would burden him with further debt and put the federal government as yet another creditor for Plaintiff to have to deal with.

102. Because Defendants could not beat Plaintiff on the law and facts in *Brooks I*—they decided to willfully break the law in order to punish Mr. Brooks. Defendants executed a coordinated scheme with numerous State departments and Defendant 19th Judicial District to illegally seize his $3.5 million judgment through a state mechanism that had never been used in this manner.

103. While Plaintiff had no idea of the coordination of the scheme, Mr. Brooks inherently knew what Defendants would do to punish him in retaliation for winning the award in *Brooks I*, as his April 18, 2023, letter to Defendant Mileham outlined. So how did Mr. Brooks know before it happened? That answer is simple—the numerous comments by Defendant Urquhart stating that Plaintiff "would never get the money" outside the courtroom in *Brooks I*, followed by the actions of Defendants through their poor faith mediation were clearly understood threats to Plaintiff. In fact, it appears the conspiracy was hatched shortly after mediation, as the restitution lien ended up being filed under secrecy a few months later.

104. DOE Defendants in the AG's office intentionally and maliciously misadvised numerous State agencies on the law and facts surrounding the intercept, as again Plaintiff knew was happening. No reasonable person with any legal knowledge would advise that C.R.S. § 16-18.5-104(5)(b) applies to Mr. Brooks, making the restitution lien a knowingly created and intentionally filed fraudulent document. Moreover, no attorney would ever reasonably

advise state actors to swear to secrecy to prevent all pre-deprivation due process, nor order

them to get rid of the money in a single day, or intentionally lie to the courts, as Defendants

did repeatedly. Moreover, Defendant Mileham didn't even know basic legal parameters and

failed to understand the Office of Risk Management—which she directs—would have to

pay the award until September 2023—after Plaintiff expressly told her in April 2023 that

Risk Management would be required to make payment by law.

105. Additionally, if Defendants coding scheme was to be unsuccessful, Defendant Lujan

suggested, "if this process will take too long to setup [in CORE] maybe an option would be

to use the COLL debt type since already established? Once funds are collected and received

by DPA, we could work with DPA's controller to do an internal transfer to obtain the funds."

Thus, Defendants had a back up plan to illegally steal the money and fast as possible to

prevent pre-deprivation due process, without any statutory authority, and Defendant Lujan

clarified "per [Defendant] Lynda Lindsey, Brad Duca and the AG's office contacted Judicial

on this situation so all are aware." Hence, all Defendants wanted to punish Mr. Brooks, no

matter how it occurred, all because of his victory in petitioning the court for a redress of

grievances in *Brooks I*—and their goal—ensure Mr. Brooks would not see a dime of the

judgments proceeds and attempt leave him with a million plus dollar tax burden.

106. Had Defendants truly believed their actions were lawful, at the very least Defendants Jaros

and Mileham would have provided Plaintiff with the mandatory notice of the Intercept

Statue, alerting Mr. Brooks "of the controller's authority to withhold debts owed to state

agencies under the vendor offset intercept system pursuant to section 24-30-202.4 (3.5)(a)(I)

and the types of debts that are subject to withholding under said system." C.R.S. § 24-30-

202(1)." On October 25, 2023, Defendant Jaros personally approved adding Plaintiff's

restitution debt to the Intercept Request table in CORE and at this moment it time was
mandated by statute to send Plaintiff notice of "the controller's authority to withhold debts
owed to state agencies under the vendor offset intercept system," yet Defendant Jaros
intentionally and maliciously violated these statutory duties.

107. Additionally, Defendants fully understand restitution is not a listed debt under the Intercept
Statute, as it is not listed in section 24-30-202.4 (3.5)(a)(I). And because their intent was to
punish, they intentionally violated Plaintiffs due process rights to hide their conspiracy,
knowing Plaintiff would have stopped it in its tracks.

108. If Defendant 19th Judicial District, Palma, Manbeck, and Hoffman believed their actions
were legal, they would have ensured Plaintiff was provided with notice of the creation and
filing of the fraudulent restitution lien—but they refused. Additionally, even if

109. Had Defendant Lindsey believed her actions were legal, she would have notified Plaintiff
that Restitution Services was attempting to collect on his restitution debt on behalf of the
victims of his criminal case, but she didn't.

110. Additionally, because the State was stealing the judgment on the victims behalf, the
coordination of victims and the State to work together to collect restitution is specifically
prohibited by statute. "Upon receipt of notice of intent to pursue collection, [by any victim]
the court, the collections investigator, and the department of corrections *shall cease all
attempts to collect the restitution due to the person* or persons named in the notice, except
that the collections investigator may still assist the victim in the victim's effort." C.R.S. §
16-18.5-107(1). Furthermore, "any victim who has filed a notice of intent to pursue
collection may apply to the sentencing court for issuance of any of the following that, if
provided, shall be provided without cost: (a) One or more certified copies of the transcript

35

of the order for restitution (b) An order that a portion of the defendant's earnings be withheld
pursuant to section 16-18.5-105 (3)(b); (c) A writ of execution, writ of attachment, or other
civil process to collect upon a judgment pursuant to article 52 of title 13, C.R.S." C.R.S. §
16-18.5-107(2).

111. Defendants knew, however, that had they gone through the required civil recovery process
    and even if Plaintiff's judgment was not exempt from garnishment pursuant to C.R.S. § 13-
    54-102(1)(n), an attachment of earnings on the judgment could "not to exceed fifty percent,
    [to] be withheld and applied to any unpaid restitution." C.R.S. § 16-18.5-105 (3)(b). Thus,
    under the most beneficial legal consideration, Plaintiff was required to be paid at least half
    of the $3.6 million judgment, which Defendants fully understood.

112. Defendant Stathopoulos knew court intervention was likely required and himself
    questioned the lawfulness of his own action, through his own words, and then had his office
    provide Plaintiff with a spurious 1099-MISC form that is also fraudulent.

113. Defendants' actions were unlawful, malicious, knowing, willful, reckless, and negligent
    at best—all because their intent was to punish Mr. Brooks.

114. DOE Defendants in the AG's office directed Defendants to generate fraudulent liens, issue
    a punitive tax form, and deny all procedural avenues for challenge or refund—including
    insuring the process was held to secrecy. These retaliatory actions were designed to punish
    Plaintiff for his successful lawsuit and deter others from seeking redress against the state.

115. In effect, while the issue of whether Defendant CDOC satisfied the judgment in *Brooks I*
    is currently pending in the Tenth Circuit, if it is determined Defendant CDOC satisfied the
    judgment, Plaintiff will be forced to forgo the award because he cannot pay the tax on the
    judgment. In other words, due to Defendants' retaliation, Mr. Brooks is worse off by

vindicating his rights than if he had never sued—exactly what the First Amendment is designed to prevent

116. Further, Defendants CDOC and Urquhart made affirmative misrepresentations in *Brooks I* to blind Plaintiff to their conspiracy, Defendant Palma lied directly to Mr. Homiak about Defendant 19th Judicial Districts intervention in the intercept, Defendant Mileham omitted telling Mr. Homiak what she knew was going to occur, and Defendant Milham and Jaros violated their statutory code of ethics and numerous state statues governing their own understood authority and executed the illegal plan a day after Mr. Homiak requested they halt any attempt to intercept the funds.

117. Defendant CDOC, Sanchez, Mileham, and Urquhart directly usurped the State Claims Board authority to settle Plaintiff's claims just to ensure he would not personally benefit from the judgment, defrauding state taxpayers of at least $2 million.

118. To retaliate further, without any custody control over Mr. Brooks and having no jurisdiction over him or his restitution debt, Defendant CDOC sent a letter to all the victims of Plaintiff's criminal case, alerting them to Plaintiff winning the judgment and essentially allowing all of the victims to seek court actions against Brooks. In fact, due to Defendants CDOC and Lindsey's coordination with Plaintiff's victims, he was summoned to Boulder County by victim Jason Greathouse's attorney under the threat of arrest to answer interrogatories about this judgment, which was Defendants intent—to cause as much harm to Plaintiff as possible and to punish him for exercising his First Amendment rights. Once again, because Jason Greathouse was attempting to collect on the judgment on his own behalf, the state was statutorily required to cease collection on his behalf, yet almost a million dollars was sent to Mr. Greathouse from the judgment, when he suffered no

pecuniary loss whatsoever.

119.  As a parting final act of retaliatory action, Defendant Stathopoulos office issued Plaintiff
a fraudulent 1099-MISC form asserting the entire judgment is taxable income, in direct
violation of Defendant Jaros technical guidance. In fact, because Defendants are baselessly
asserting no part of the judgment in *Brooks I* was for personal injury or sickness, they are
automatically suggesting Mr. Brooks is required to pay over a million dollars in tax on the
judgment. This was a targeted maneuver to punish Brooks further, subjecting him to civil
and possible criminal penalties by the federal government for his inability to pay.

120.  Finally, in response to Plaintiff notifying Defendant CDOC that he will be moving to
vacate the judgment in *Brooks I* if the Tenth Circuit upholds Judge Crews ruling that
Defendant CDOC satisfied the judgment, DOE Defendants in the AG's office said they will
be opposing any attempt Mr. Brooks makes to do so. In other words, Defendants are going
to object to the State getting over $3.6 million back through a voluntary forfeiture of the
award—and why—to ensure Mr. Brooks is left with a tax burden they know he cant pay.
These actions are beyond the pale and speak for themselves.

121.  These adverse actions described above were substantially motivated by Defendants' desire
to retaliate against Plaintiff for exercising his First Amendment rights and to punish him for
prevailing in litigation against Defendant CDOC.

122.  Defendants' retaliatory acts have caused Plaintiff significant harm, including the loss of
his $3.6 million judgment, incurrence of immense tax liability, emotional distress, loss of
use of funds, and financial hardship—all of which were intended.

## CLAIM FOUR

**The Colorado Restitution Act is Unconstitutional as Applied to Plaintiff for Violating
the Excessive Fines Clause of the United States Constitution**

123. Plaintiff's restitution obligation has been at the center of this entire controversy. When
Plaintiff was sentenced, he was ordered to pay $5,131,760.96 in restitution. Yet the State of
Colorado simultaneously foreclosed Plaintiff's ability to make any meaningful repayment
by sentencing him to thirty-two years in prison for his inability to pay that amount. The
result was the harshest sentence for securities fraud ever imposed on a first-time offender in
U.S. history, state or federal.

124. Colorado's Restitution Act declares that "[a]n effective criminal justice system requires
timely restitution to victims of crime and to members of the immediate families of such
victims in order to lessen the financial burdens inflicted upon them, to compensate them for
their suffering and hardship, and to preserve the individual dignity of victims." C.R.S. § 18-
1.3-601(1)(e). Yet by sentencing Plaintiff to thirty-two years of imprisonment, the State
itself eliminated any possibility of "timely" restitution for victims. In effect, the statutory
purpose was thwarted by the State's own actions.

125. Federal law demonstrates an awareness of the constitutional limits imposed by the
Excessive Fines Clause. Under 18 U.S.C. § 3612(f)(3)(A), Congress expressly authorized
courts to waive interest if a defendant lacks the ability to pay. This discretionary safeguard
ensures that restitution interest does not become punitive in violation of the Eighth
Amendment.

126. By contrast, Colorado law historically provided no such discretion. Section 18-1.3-
603(4)(b)(I), C.R.S., mandated that "the defendant owes simple interest from the date of the
entry of the order at the rate of eight percent per annum," regardless of ability to pay.

127. In Plaintiff's case, the trial court recognized that Plaintiff lacked any meaningful ability to pay restitution, yet Colorado law deprived the court of discretion to waive interest. As a result, Plaintiff was assessed more than $4 million in mandatory interest while incarcerated — at an average rate of approximately $34,000 per month — despite having no capacity to generate income while serving a decades-long prison term.

128. This mandatory interest scheme inflicted punishment solely on the basis of Plaintiff's poverty, in direct violation of *Bearden v. Georgia*, 461 U.S. 660, 672–73 (1983), which held that it is unconstitutional to impose additional punishment upon a defendant solely because of inability to pay.

129. In 2019, Colorado's legislature recognized that charging interest on restitution while a defendant is imprisoned is excessive and unconstitutional. The law was amended to provide: "Interest on an order for restitution does not accrue while … [t]he defendant is serving in a correctional facility operated by … the department of corrections." § 18-1.3-603(4)(b.5)(I), C.R.S., as amended by H.B. 19-1310, ch. 303, p. 2778, § 1 (effective July 1, 2019).

130. This amendment demonstrates the State's recognition that the prior statutory scheme violated the Excessive Fines Clause, as incorporated against the States in *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019).

131. Plaintiff is constitutionally entitled to the retroactive benefit of this change in law. Where a statute has been amended to eliminate an unconstitutional practice, the Constitution requires that ongoing penalties imposed under the prior scheme be vacated. Thus, all interest applied to Plaintiff's restitution obligation from April 27, 2010, through August 15, 2021, must be vacated as a matter of law.

132. Moreover, even after his release from prison, charging Plaintiff $34,000 per month in

restitution interest remains unconstitutional as applied. Plaintiff's continuing inability to pay renders such charges punitive, not compensatory, and therefore "excessive" within the meaning of the Eighth Amendment.

133. As a result of Colorado's unconstitutional restitution-interest scheme, Plaintiff has been assessed over $4 million in unlawful interest charges, which nearly doubled his restitution obligation, destroyed his post-release economic prospects, impaired his ability to reintegrate into society, and inflicted ongoing financial harm.

134. Plaintiff therefore seeks declaratory and injunctive relief vacating all restitution interest assessed during his incarceration, a declaration that Colorado's mandatory interest provision is unconstitutional as applied to him, and an order barring the State from assessing any interest against him on his restitution judgment.

## D. REQUEST FOR RELIEF

*State the relief you are requesting or what you want the court to do. If additional space is needed to identify the relief you are requesting, use extra paper to request relief. Please indicate that additional paper is attached and label the additional pages regarding relief as "E. REQUEST FOR RELIEF."*

   **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against all Defendants, jointly and severally, and award the following relief:

**I.  Declaratory Relief**

1. Declare that Defendants' actions in filing and enforcing the restitution lien against Plaintiff were unlawful and void *ab initio*.

2. Declare that Defendants' actions violated Plaintiff's rights under the First Amendment to the United States Constitution by retaliating against him for protected petitioning activity.

3. Declare that Defendants' actions violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment.

41

4. Declare that Defendants engaged in a civil conspiracy, using unlawful means and overt acts, to deprive Plaintiff of his constitutional rights and property.

5. A declaration that Colorado's mandatory restitution-interest scheme, as applied to Plaintiff, violates the Excessive Fines Clause of the Eighth Amendment.

## II.    Injunctive Relief

6. Issue an injunction directing Defendants to immediately remove the fraudulent restitution lien from the Colorado Secretary of State's records.

7. Issue an injunction prohibiting Defendants from using C.R.S. § 24-30-202.4 or any intercept process to seize Plaintiff's funds based on restitution debts not authorized by statute.

8. Issue an injunction requiring the return of all funds seized from Plaintiff pursuant to the void lien and intercept, with Colorado statutory interest of 8%, which is the same percentage Mr. Brooks is required to pay on his restitution interest.

9. Issue an injunction requiring Defendants Weiser, Mileham, and Jaros, and all involved state agencies to implement training to ensure future compliance with constitutional due process and statutory limitations on debt collection.

10. An injunction prohibiting the State of Colorado, its agencies, or agents from assessing, collecting, or enforcing any restitution interest against Plaintiff for the period of his incarceration (April 27, 2010 – August 16, 2021) and prospectively while he remains unable to pay.

11. **Restitution / Vacatur of Unconstitutional Interest** – An order vacating and striking all restitution interest that accrued against Plaintiff during and post-incarceration, estimated to exceed $4,000,000.

## III.    Compensatory and Special Damages

9. Award Plaintiff $7,000,000 in compensatory damages to restore the value of the $3.5 million judgment wrongfully seized, accounting for taxation consequences.

10. Award Plaintiff an additional $3,000,000 in special damages for consequential financial losses, including IRS tax liability on the wrongfully issued 1099, costs of litigation, and loss of use of funds.

42

11. Award Plaintiff ~$10,000,000 to pay off his restitution in full[12] to ensure victims do not get defrauded and harmed by the State for Defendants malicious actions and to ensure fundamental fairness. If the State was required to go back after victims to recuperate the money spent, they would then come after Mr. Brooks *ad infinitum*, so the harm would be catastrophic to both Plaintiff and the victims of his criminal case due to Defendants conduct. This portion of the award is further required to ensure the State has no mechanism to claim any part of the initial award Plaintiff was legally entitled to, which was fully exempt from any garnishment., and to avoid further retaliatory actions against Plaintiff.

IV.     **Punitive Damages**

12. Award punitive damages in the amount of $40,000,000 against all individual Defendants in their individual capacities for willful, wanton, negligent, and malicious conduct in violation of Plaintiff's constitutional rights.

13. **Maximum Reprehensibility**--Defendants' conduct involved a deliberate, coordinated scheme by multiple state agencies and officials to: Fabricate and file a fraudulent restitution lien; Circumvent statutory collection procedures; Seize funds known to be likely exempt under C.R.S. § 13-54-102; Deprive Plaintiff of notice and an opportunity to be heard; and Retaliate against Plaintiff for exercising his First Amendment rights. Such conduct represents the highest degree of reprehensibility recognized under *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and *State Farm v. Campbell*, 538 U.S. 408 (2003).

14. **Breach of Public Trust**—As the Supreme Court recognized in *Smith v. Wade*, 461 U.S. 30 (1983), punitive damages are especially appropriate to punish and deter public officials who abuse their governmental authority. Defendants' actions here involved the misuse of sovereign powers for private benefit, undermining the integrity of the judicial system itself.

15. **Need for Deterrence**—The State of Colorado has substantial resources, and without a significant punitive award, there is little incentive to prevent such misconduct

---

[12] Depending upon the result of the Excessive Fines Claim Four, these amount will be adjusted accordingly to calculate Plaintiff's actual loss.

in the future. The amount requested is necessary to deter both the named Defendants and similarly situated officials from engaging in similar conduct.

16. **Ratio to Compensatory Damages**—The requested punitive award is just two times the requested compensatory damages, well within the constitutional range upheld in *State Farm v. Campbell*, where the Court noted that higher ratios may be appropriate when compensatory damages are substantial but the conduct is particularly egregious.

17. **Pattern and Cover-Up**—Defendants' creation of a one-off computer code to intercept Plaintiff's judgment, backup plan to transfer the money through another illegal avenue, making rapid payment to victims to prevent judicial review, and concealment of their actions from Plaintiff demonstrate intentional malice and calculated deception—aggravating factors that justify a substantial punitive award.

## V.    Other Relief

18. Refer the evidence of criminal conduct by Defendants to the United States Department of Justice for investigation and prosecution.

19. Refer all licensed attorney Defendants to the Colorado Office of Attorney Regulation Counsel and the American Bar Association for investigation into professional misconduct.

20. Award Plaintiff his costs, reasonable attorney's fees, and such other relief as this Court deems just and proper. In fact, just because Mr. Brooks is a *pro se* filer, he will be requesting fees at a rate of $150 an hour (paralegal rate) due to his litigation experience and the equal protection violation that would result if he would not be entitled to compensation for the work he has been forced to complete on his own behalf due to Defendants actions.